IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TYRA FREEMAN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, | : | NO. 05-2078 |
| Commissioner of | : | |
| Social Security Administration | : | |

**REPORT AND RECOMMENDATION**

THOMAS J. RUETER                                                                February 23, 2006
United States Magistrate Judge

       Plaintiff, Tyra Freeman, filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claims for disability insurance benefits ("DIB") under Title II and supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act").

       Each party filed a motion for summary judgment.  For the reasons set forth below, this court recommends that plaintiff's motion for summary judgment be GRANTED and the Commissioner's motion for summary judgment be DENIED.[1]

---

      [1]     In her brief in support of her motion for summary judgment, plaintiff requests that the decision of the Commissioner be reversed and benefits awarded.  (Pl.'s Br. Supp. Summ. J. at 30.)  The Third Circuit has recognized that a decision to reverse an unfavorable determination and award benefits "should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits."  Podedworny v. Harris, 745 F.2d 210, 221-22 (3d Cir. 1984).  "The cases in which the Third Circuit has decided to forego a remand and award benefits are cases in which the Commissioner has previously had ample opportunity to develop the record and has failed repeatedly to explain or support its determination with substantial evidence, or where substantial evidence exists in the record to support an award of benefits."  Eary v. Halter, 2001 WL 695045, at *6 (E.D. Pa. June 18, 2001) (citing cases).  "A reversal, as opposed to remand, is in order only where a fully developed administrative record demonstrates that the claimant is clearly entitled to benefits, and thus a new administrative hearing would serve no useful purpose."  Podedworny, 745 F.2d at 224 (concurrence).  In the instant matter, the ALJ failed to properly resolve inconsistencies in the record.  That failure impacted, or may impact, the

I.       **FACTUAL AND PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI, alleging disability since October 20, 2000 due to Bipolar Disorder, Post Traumatic Stress Disorder and Major Depressive Disorder. (R. 61-64, 77-86.)  The claims were denied initially.[2]  (R. 186.)  Upon the request of plaintiff, a hearing was held before Administrative Law Judge ("ALJ") William Reddy.  (R. 28-45.) Plaintiff, represented by counsel, and Beth Kelley, a Vocational Expert ("VE"), testified at the hearing.  Id.  In a decision dated February 17, 2004, the ALJ found that plaintiff was not disabled under the Act.  (R. 15-23.)  The ALJ made the following findings:

> 1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through June 30, 2003.
>
> 2. The claimant has not engaged in substantial gainful activity since October 20, 2000.
>
> 3. The medical evidence establishes that the claimant suffers from depression with psychotic features, an impairment that is severe but does not equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  (20 CFR §§ 404.1521 and 416.921).
>
> 4. The undersigned finds the claimant's allegations regarding her limitations are exaggerated, and not supported by the medical evidence of record.
>
> 5. The claimant retains the capacity to perform work activity at all exertional levels.  The claimant has the mental residual functional capacity to perform simple, routine task [sic].

---

ALJ's determination regarding plaintiff's disability.  Those decisions are reserved for the ALJ, not this court.  As such, further consideration by the ALJ will serve a useful purpose.  For this reason, the court recommends that the case be remanded, not reversed.

[2]      Pursuant to the Commissioner's disability process redesign program, plaintiff was permitted to seek review of the unfavorable initial determination by an ALJ without first seeking reconsideration.  (R. 186.)

> 6. The claimant's mental impairment prevents her from performing her past relevant work.
>
> 7. The claimant is a "younger individual" with past relevant work as a nurse assistant, a cook, a counselor, an information clerk, and a housekeeper. She has a "high school" education, plus two years of college (20 C.F.R. §§ 404.1563, 404.1546, 404.1565, 416.963, 416.964, and 416.965).
>
> 8. Based upon the claimant's age, educational background and residual functional capacity, she is able to make a successful vocational adjustment to work which exists in significant numbers in the national economy. This finding is based upon Medical-Vocational Guideline 204.00, and vocational expert evidence.
>
> 9. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520 and 416.920(f)).

(R. 22-23.)

Plaintiff filed a request for review of the decision of the ALJ that was denied by the Appeals Council. (R. 5-10.) The ALJ's decision became the final decision of the Commissioner. Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

The role of this court on judicial review is to determine whether there is substantial evidence in the record to support the Commissioner's decision. Jesurum v. Sec'y of United States Dep't of Health and Human Serv., 48 F.3d 114, 117 (3d Cir. 1995). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Substantial evidence is more than a mere scintilla of evidence, but may be less than a preponderance of the evidence. Jesurum, 48 F.3d at 117. This court may not weigh evidence or

substitute its conclusions for those of the fact-finder.  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002) (citing Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924 (1993)).  As the Third Circuit stated, "so long as an agency's fact-finding is supported by substantial evidence, reviewing courts lack power to reverse . . . those findings."  Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1191 (3d Cir. 1986).

To be eligible for benefits, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  Specifically, the impairments must be such that the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

Under the Act, the claimant has the burden of proving the existence of a disability and must furnish medical evidence indicating the severity of the impairment.  42 U.S.C. § 423(d)(5).  A claimant satisfies this burden by showing an inability to return to former work.  Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979).  Once this standard is met, the burden of proof shifts to the Commissioner to show that given the claimant's age, education, and work experience the claimant has the ability to perform specific jobs that exist in the national economy.  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f); 416.920(f).

The Commissioner decided this matter by utilizing the five step sequential evaluation process established by the Department of Health and Human Services to determine

whether a person is "disabled." This process requires the Commissioner to consider, in sequence, whether a claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment which meets or equals the requirements of a listed impairment; (4) can perform past relevant work; and (5) if not, whether the claimant is able to perform other work, in view of his age, education, and work experience. 20 C.F.R. §§ 404.1520; 416.920.

### III.    BACKGROUND

#### A.    Plaintiff's Testimony, December 15, 2003

Plaintiff testified that she lived with her two children, ages thirteen and eighteen. (R. 31-32.) She had not worked since October 2000.[3] (R. 32.) Plaintiff explained that her psychiatric condition impeded her ability to work. She maintained that she could not deal with any kind of stress, since stress caused her to shake and become confused and speechless. (R. 33.) Plaintiff added that "voices in [my] head tell me that they hate me and I can't do anything right." Id. [4]

Plaintiff was treated for depression at Intercultural Family Services. (R. 32.) She

---

[3]    At the hearing, the ALJ explained that medical records indicated that plaintiff had worked as a nursing assistant from June to October 2002. (R. 32.) Plaintiff replied: "No. I haven't worked since 2000." Id. Plaintiff related that she was fired from her job in October 2000 because she missed worked due to an "episode of depression." (R. 40.)

[4]    Plaintiff elaborated about the voices:

> Sometimes I hear conversations, and they sound like, you know, two people having a conversation. Sometimes I hear somebody calling my name when there's nobody there. But a lot of times the voices just tell me I'm a bad girl, and I'm not worth anything, and I say I don't see, and I never see anything and I'm a real good girl. I'm a good girl. I'm a good girl. I'm a good girl. Please somebody tell me I'm a good girl.

(R. 37.)

saw a therapist once per week, and a psychiatrist on a monthly basis. Id. Plaintiff experienced crying spells approximately three times per week. (R. 39.) Plaintiff took medication to treat her condition, but her medication had been changed on several occasions because it lost its efficacy over time. Id.

With respect to her activities of daily living, plaintiff reported that she slept "most of the day and most of the night." (R. 34.) Plaintiff's children performed the majority of the household chores, including cooking, cleaning and laundry. (R. 35-36.) Plaintiff's lack of concentration precluded her from performing these duties. (R. 34.) She had to be reminded to take medication and pay bills. Id. Plaintiff attempted to take a correspondence course to become a pharmacist's assistant, but she was unable to complete the course. (R. 35.) Plaintiff's sister and sister-in-law visited her several times per week. (R. 36-37.) Occasionally, plaintiff was taken to church by a neighbor. (R. 36.)

### B.     Testimony of VE, Beth Kelley, December 15, 2003

The VE characterized plaintiff's nursing assistant and counselor positions as medium exertional, semi-skilled work. (R. 41.) The information clerk position was sedentary, semi-skilled work. Id. The cook and cashier positions were light and semi-skilled, and the housekeeping position was light and unskilled. (R. 42.)

In response to questioning by the ALJ, the VE opined that an individual who was limited to performing only simple, routine tasks would be precluded from performing all types of work except unskilled work. Id. According to the VE, the ability to perform only simple, routine tasks also would impact an individual's ability to perform some unskilled work, particularly jobs which involved customer service. The VE explained that customer services jobs often required

workers to face unpredictable situations which would pose difficulty for an individual with limited ability to perform certain tasks. (R. 42-43.)

> The ALJ posed the following hypothetical to the VE:
>
> Well, if you had a hypothetical individual who didn't have any exertional limitations, who was limited to just simple routine tasks. And had Ms. Freeman's age of 38, 14 years of education and the past work experience that you just described. Would there be unskilled occupations that the hypothetical individual could perform?

(R. 43.) The VE opined that such an individual could perform the jobs of "housekeeping cleaner," assembler, and packer. Id. The VE added that if plaintiff's testimony were fully credible, she would be unable to perform work since "an individual who's spending an exorbitant amount of time in bed, is not going to be available to show up at a job, and would not be able to sustain work." (R. 44.) The VE further averred that an individual who was unable to sustain any work stress would be unemployable. Id.

### C. **Medical Evidence**

Plaintiff sought psychiatric treatment at Intercultural Family Services Outpatient Clinic in September 2000. She reported depressive symptoms which included: crying episodes, difficulty sleeping, social withdrawal, and low self esteem. (R. 176-82.) Plaintiff related that her husband recently confessed to multiple extra-marital affairs and plaintiff planned to divorce him. (R. 179.) Plaintiff described her childhood as "chaotic" and explained that she had alcoholic parents. Her father was both physically and verbally abusive. Id. Upon examination, plaintiff was in acute distress, tearful, dejected and had a labile effect. (R. 181.) She was assessed with a

Global Assessment of Functioning "("GAF") score of fifty,[5] and referred for a psychiatric evaluation. Id.

In December 2000, M. Bien-Aime, M.D., completed a work-capacity assessment form in connection with plaintiff's application for general assistance. (R. 127.) Dr. Bien-Aime diagnosed plaintiff with Biopolar II Disorder and severe recurrent major depressive disorder with psychotic features. Id. The physician determined that plaintiff was "incapacitated" due to a profoundly limiting physical or mental condition which permanently precluded any form of employment. Plaintiff's functional limitations were listed as: "depressed–lethargic–not able to function–mood instability." Id.

In January 2002,[6] Dr. Bien-Aime conducted a psychiatric evaluation of plaintiff. (R. 171-75.) Plaintiff reported a ten year history of depression and an abusive childhood. (R. 171.) Progress notes indicated that plaintiff was diagnosed with Depressive Disorder in October 2000 and was prescribed Prozac[7]. Id. During her treatment, plaintiff complained of auditory

---

[5] A GAF score of forty-one to fifty indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school function (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994).

[6] In connection with plaintiff's application for general assistance, Dr. Bien-Aime completed additional forms on January 2, 2002 and January 3, 2003. (R. 125-26.) These forms mirrored the form he completed in January 2000. (R. 127.)

[7] Prozac is indicated for the treatment of depression and obsessions and compulsions in patients with obsessive-compulsive disorder. The most commonly observed adverse events associated with the use of Prozac are: anxiety, nervousness and insomnia, drowsiness with fatigue or weakness, tremor, sweating, gastrointestinal complaints, including anorexia, nausea and diarrhea, dizziness or lightheadedness. Physicians' Desk Reference ("PDR"), at 935-39 (51st ed. 1997). Zyprexa is an antipsychotic agent, indicated for the treatment of depression. Id. at 1649-52. Paxil is indicated for the treatment of depression. The most commonly observed adverse events associated with Paxil by patients with depression

hallucinations; as a result her medication was switched to Zyprexa. She eventually was switched to Paxil, due to depression and anxiety attacks which were associated with Prozac. At the time of the January evaluation, plaintiff continued to experience "bouts of depressive mood along with anxiety." Id.

Dr. Bien-Aime described plaintiff's mood as "mildly" dysphoric and her affect "mildly" restricted. (R. 174.) Her attention, concentration and memory were fair. She had good judgment and adequate impulse control. Id. Plaintiff was diagnosed with a major depressive disorder with psychotic features, obesity, and severe stressors. She was assessed with a GAF score of fifty-five[8]. Id.

Dr. Bien-Aime's progress notes related that in December 2002, plaintiff was "very depressed with suicidal thought," but had no plan or intent. (R. 170.) At that time, she experienced recurrent crying spells, flashbacks and very poor sleep. She was prescribed Paxil and Zyprexa. Id. In February 2003, the physician reported that plaintiff was not taking her medication regularly; however, plaintiff was less depressed notwithstanding the fact that she had not been taking medication as prescribed. Id. The following month, plaintiff was feeling down and the auditory hallucinations reportedly had become more frequent. Plaintiff's dosage of Zyprexa was increased from ten to fifteen milligrams. Id. Progress notes from subsequent months related that plaintiff heard voices and experienced panic attacks. (R. 169.) In May 2003,

---

include: weakness, sweating, nausea, decreased appetite, somnolence, dizziness, insomnia, tremor and nervousness. Id. at 2681-85.

[8] A GAF score between fifty-one and sixty indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM-IV at 32.

plaintiff went to the emergency room for treatment of severe panic attacks.[9]  Id.  Dr. Bien-Aime reported that plaintiff was unable to handle stress and was still shaken.  Id.  In addition to Paxil, plaintiff was prescribed Risperdal, Effexor and Klonopin.[10]  Id.

That same month, plaintiff was referred to Charles Johnson, Psy.D., for a psychological evaluation at the behest of the Commissioner.  (R. 130-35.)  Plaintiff informed Dr. Johnson that she had been depressed since she was a teenager, but received her first mental health treatment at age twenty-three.  (R. 131.)  Plaintiff received treatment from Intercultural Behavioral Services for two and one-half years and saw a psychiatrist once per month and a mental health therapist weekly.  Id.

Dr. Johnson reported that plaintiff's psychomotor movements reflected slowness in ambulation.  Her mood and affect were described by plaintiff as "bad."  Id.  Plaintiff reported auditory hallucinations, and difficulty eating and sleeping.  Id.  Dr. Johnson related that plaintiff's thought processes were "logical and incoherent," and "clinical paranoia was acclaimed."  Id.  Her concentration and attention span were fair, as were social judgment, impulse control and insight.  (R. 131-32.)

With respect to her activities of daily living, plaintiff informed Dr. Johnson that she spent her days "sleeping."  (R. 132.)  She did not cook or perform housekeeping tasks.  On

---

[9]   Medical records from Fitzgerald Mercy Hospital indicated that plaintiff sought emergency room treatment because she was upset that her son had gotten into an altercation with another child and one of the children wielded a knife.  (R. 159.)

[10]   Effexor is indicated for the treatment of depression and generalized anxiety disorder.  The most common side effects include: nausea, headache, dizziness, fatigue, somnolence, nervousness and insomnia.  PDR at 3237-42.  Klonopin is indicated for the treatment of seizures and panic disorder.  Id. at 2646-48.

occasion, plaintiff received assistance dressing herself.  Id.  She used public transportation unaccompanied.  Dr. Johnson diagnosed plaintiff with dysthymic disorder, bipolar disorder, NOS (provisional), and asthma.  Id.  He opined that plaintiff presented a "fair prognosis with respect to continue [sic] psychiatric treatment."  Id.

With respect to making occupational adjustments, Dr. Johnson characterized plaintiff's ability to perform the following as "fair:"  follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, function independently, and maintain attention/concentration.  (R. 134.)  Dr. Johnson found that plaintiff's ability to deal with work stressors was "poor/none."  Id.  Dr. Johnson concluded that plaintiff's ability to understand, remember and carry out complex job instructions was "poor/none," but her ability to carry out detailed and simple job instructions was "fair."  Id.  Finally, Dr. Johnson opined that plaintiff had a fair ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  (R. 135.)

On June 4, 2003, Dr. Bien-Aime noted that plaintiff was feeling less depressed and was not suffering from panic attacks or auditory hallucinations at that time.  (R. 169.)  On June 10, 2003, Jonathan Rightmyer, Ph.D., a non-examining state agency psychological consultant, completed a Mental Residual Functional Capacity Assessment.  (R. 136-39.)  Dr. Rightmyer determined that plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods.  (R. 136-37.)  Dr. Rightmyer reported that plaintiff was "enrolled now in pharmacy course. . . and

now works 20-25 hr/wk." (R. 152.) Dr. Rightmyer based his conclusion that plaintiff could perform work on this presumption. Id.

Dr. Rightmyer also completed a Psychiatric Review Technique Form wherein he analyzed plaintiff's functional limitations pursuant to Listing 12.04. (R. 140-53.) Dr. Rightmyer determined that plaintiff had a mild degree of limitation performing activities of daily living and maintaining social functioning. (R. 150.) He also concluded that plaintiff had moderate difficulty in maintaining concentration, persistence or pace, but experienced no episodes of decompensation. Id.

Dr. Bien-Aime reported in July 2003 that plaintiff continued to show good response to treatment and was stable on her medications. (R. 169.) In August 2003, plaintiff continued to show improvement but her dosage of Effexor and Klonopin was increased, as plaintiff was still shaky at times. Her auditory hallucinations continued to diminish. (R. 168.) In September and October 2003, plaintiff was still depressed and continued to hear voices. Id.

## IV.  DISCUSSION

Plaintiff was thirty-eight years old at the time of the ALJ's decision and was therefore considered a "younger person" under the Act. (R. 18.) See 20 C.F.R. §§ 404.1563, 416.963. She had past relevant work experience as a nursing assistant, cook, counselor, information clerk and housekeeper. (R. 91.) The ALJ found that the evidence of record supported a finding that plaintiff had depression with psychotic features, an impairment that was severe within the meaning of the regulations, but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (R. 23.) Ultimately, the ALJ concluded that plaintiff, although unable to return to her past relevant work, was able to

make an adjustment to work that existed in significant numbers in the national economy.  Id.

In the brief in support of her motion for summary judgment, plaintiff argues that the ALJ "erred in finding that plaintiff's mental impairments, although severe, do not meet or equal the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4" because the ALJ erroneously rejected the findings and opinions of her treating physician regarding the extent of her mental limitations.  (Pl.'s Br. Supp. Summ. J. at 17-20.)  Plaintiff also avers that the ALJ failed to evaluate plaintiff's residual functional capacity ("RFC") and prove that plaintiff retained the ability to perform "her past relevant work or any work that exists in significant numbers in the national or local economy."  Id. at 23-30.  Defendant maintains that substantial evidence supports the decision of the ALJ that plaintiff was not disabled.  (Def.'s Br. Supp. Summ. J. at 8-27.)

Plaintiff argues that it was error for the ALJ to reject the treating physician's opinion that plaintiff's mental condition was disabling.  (Pl.'s Br. Supp. Summ. J. at 20-23.)  A treating physician's opinion as to disability is not dispositive.  See Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994).  Rather, the Commissioner reserves the ability to determine disability under the Act.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  A treating physician's opinion is entitled to controlling weight if it is consistent with the other substantial evidence in the record and is supported by medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If substantial evidence in the record supports a conclusion contrary to that of the treating physician, however, the ALJ may reject the treating physician's findings.  Frankenfeld v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988).  "An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence,

13

but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985)).  When rejecting a treating physician's opinion, "an ALJ may not make speculative inferences from medical reports," and may reject the opinion "outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (internal quotes and citations omitted).  Furthermore, "[w]here . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason." Id.  See also Plummer, 186 F.3d at 429 (same).

In assessing whether plaintiff's impairment meets or equals any of the impairments listed in Appendix 1, Subpart P, Regulation No.4, specifically Listing 12.04 (Affective Disorders), the ALJ discounted the opinion of plaintiff's treating physician, Dr. Bien-Aime as well as the opinion of the consultative examining psychologist, Dr. Johnson.  The ALJ based his decision to discredit these opinions, in large part, on the opinion of Dr. Rightmyer, a non-examining consultative physician, who concluded that plaintiff was capable of working a normal work-day and workweek without interruptions from psychologically based symptoms. (R. 19.)  While the ALJ was empowered to choose between opinions, the ALJ also had a duty to resolve inconsistencies in the record.  The Third Circuit has stated, "where there is conflicting probative evidence in the record, [there is] a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and [the court] will vacate or remand a case where such an explanation is not provided." Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).

As stated heretofore, the ALJ based his opinion that plaintiff did not meet or equal a Listing on the opinion of Dr. Rightmyer. (R. 19.) However, as plaintiff correctly notes, Dr. Rightmyer based his opinion that plaintiff could work on his impression that plaintiff was working twenty to twenty-five hours per week at the time Dr. Rightmyer evaluated plaintiff's file. (Pl.'s Br. Supp. Summ. J. at 23; R. 152.) However, plaintiff testified that she had not worked since October 2000. (R. 32.) In his decision, the ALJ credited this testimony of plaintiff, and found that she had not engaged in substantial gainful activity since October 20, 2000. (R. 22.) The ALJ did not explain what weight he afforded the assertion of Dr. Rightmyer that plaintiff was working at the time of Dr. Rightmyer's evaluation. Moreover, Dr. Rightmyer assumed that plaintiff was taking a pharmacy course when he determined that plaintiff could perform work. (R. 152.) This also was refuted by plaintiff at the hearing. (R. 35.) Plaintiff asserted that although she enrolled in the pharmacy assistant course, she was forced to withdraw from the course. Id. Again, the ALJ failed to sufficiently explain what weight, if any, he placed on Dr. Rightmyer's belief that plaintiff was "attending college," and thus could perform work.[11] (R. 152.)

This court also is concerned about what impact, if any, the foregoing would have on the ALJ's assessment of plaintiff's credibility. It is conceivable that the ALJ would have

---

[11] The ALJ also discounted the opinion of Dr. Johnson, who determined that plaintiff was not capable of dealing with work stressors. (R. 19.) Since this opinion is contrary to the opinion of Dr. Rightmyer, this court finds that upon remand, the ALJ should resolve this inconsistency. Moreover, in his opinion the ALJ indicated that Dr. Johnson found that plaintiff's thought processes were "logical and incoherent." (R. 18.) The ALJ concluded that "'incoherent' is a mistake and it should be 'coherent.'" Id. However, the ALJ may not "make speculative inferences from medical reports." Morales, 225 F.3d at 317. Accordingly, on remand the ALJ should seek clarification from Dr. Johnson regarding the inconsistency in his report.

concluded that plaintiff's testimony was more credible if he had accorded less weight to the opinion of Dr. Rightmyer regarding plaintiff's ability to perform work.  It is of significant import to adequately determine whether plaintiff was capable of dealing with work stressors since the VE opined at the administrative hearing that plaintiff would not be capable of performing work if she had no ability to tolerate work stress, an opinion rendered by Dr. Johnson.  (R. 44, 133-34.)

After careful review of the record, this court recommends that the case be remanded for further consideration by the Commissioner because substantial evidence does not support the ALJ's rejection of the treating physician's opinion and the opinion of Dr. Johnson. This court recommends that the case be remanded to clarify the opinions of Drs. Rightmyer and Johnson regarding plaintiff's mental impairment and to determine whether this impairment meets or equals listing level severity.  If the ALJ finds the record to be inadequate to clarify these opinions, the regulations afford the ALJ the opportunity to seek clarification from the physician and/or to call another expert.  20 C.F.R. §§ 404.950(d)(1), 416.1450(d)(1).

## V.  CONCLUSION

Under the substantial evidence test, "the question is not whether we would arrive at the same decision; it is whether there is substantial evidence supporting the Commissioner's Decision."  Donatelli v. Barnhart, 127 Fed. Appx. 626, 630 (3d Cir. 2005) (not precedential) (citing Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1990)).  Upon remand, the Commissioner may well reach the same decision; however, in the absence of sufficient indication that the Commissioner considered all of the evidence in the case, resolved inconsistency in the record, and applied the correct legal standards, this court cannot satisfy its obligation to determine

whether substantial evidence supports the Commissioner's decision.[12] See Terwilliger v. Chater, 945 F. Supp. 836, 844 (E.D. Pa. 1996) (remanding case in the absence of sufficient indication that the Commissioner considered all of the evidence). For all the above reasons, this court finds that substantial evidence does not support the ALJ's finding that plaintiff was not disabled under the Act. Accordingly, the court makes the following:

### R E C O M M E N D A T I O N

AND NOW, this 23rd day of February, 2006, upon consideration of plaintiff's motion for summary judgment and defendant's motion for summary judgment, it is respectfully recommended that plaintiff's motion for summary judgment be GRANTED, defendant's motion for summary judgment be DENIED, and this case be REMANDED[13] to the Commissioner for

---

[12] Plaintiff also argues that the testimony of the VE failed to consider all of plaintiff's limitations that are supported by the record. (Pl.'s Br. Supp. Summ. J. at 28-29.) The law is clear that the ALJ must include in the hypothetical to the VE all of a claimant's limitations which are supported by the medical record. Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999); Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). A VE's testimony in response to a hypothetical "that fairly set forth every credible limitation established by the physical evidence," may be relied upon by the ALJ as substantial evidence. Plummer, 186 F.3d at 431.

As stated above, the ALJ failed to consider various medical findings contained in the record. As such, the hypothetical posed by the ALJ was defective and the VE's response thereto may not be relied upon by the ALJ as substantial evidence that plaintiff is not disabled. Accordingly, on remand the ALJ should reconsider his hypothetical in light of all the evidence in the record and any impact that evidence may have on the ALJ's RFC determination.

[13] Since the court recommends a remand pursuant to sentence four of 42 U.S.C. § 405(g), the court recommends that the motion for summary judgment be granted and judgment be entered in plaintiff's favor. See Shalala v. Schaefer, 509 U.S. 292, 296-97 (1993) (Sentence four of 42 U.S.C. § 405(g) authorizes a district court to enter a judgment "with or without" a remand order, not a remand order "with or without" a judgment.) See also Kadelski v. Sullivan, 30 F.3d 399, 401 (3d Cir. 1994).

further proceedings consistent with this Report and Recommendation.

                          BY THE COURT:

                          /s/ Thomas J. Rueter
                          THOMAS J. RUETER
                          United States Magistrate Judge